The case this morning is the Western Shoshone National Council v. United States. Ms. Hearn If it please the Court. By October of 1863, the United States of America knew how to write treaties to get what they needed. They had used the language that the tribes ceded, surrendered, granted, conveyed to the United States all their right, title, and interest to their lands many, many times. It was not in the Treaty of Ruby Valley. Those soldiers at that moment in time in October of 1863 in the Ruby Valley of eastern Nevada did not contemplate that there was anyone or anything that would compete to exist in the Great Basin area of Nevada. Wasn't all of that pretty well settled by 1979 when the Court of Federal Claims affirmed the finding of the Indian Claims Commission? I don't believe so, Your Honor, for this reason. I think never has there been a historical perspective of what was going on in the minds of the tribe or the nation at that time. One of the most important parts of tribal... They just lost the Battle of Beaver Creek. They weren't in a very good position to negotiate much, were they? I'm not supposed to know that history, am I? It was a very important part of their history. It certainly is. It certainly was one of the most embarrassing parts. It was a difficult time for everyone involved, I'm sure. And what was in their mind at that time? I mean, those who inhabited the eastern part of Nevada, which today I would say to you is still desolate and sparsely populated. The last area there that received telephone service was in 1988. Whoever looks at the historical perspective of what occurred to those persons at that time, the circumstances of Nevada and what the western Shoshone believed in 1863 and again in 1974... But still, isn't all this pretty well settled by, if not the Court of Federal Claims' affirmation, the Dan case a little later that extinguishes all lingering rights? But did it? Well, that's the question here. The Dan case talked about individual aboriginal rights as not being decided. It talked about tribal aboriginal rights. Where did it ever talk about the Treaty of Ruby Valley? Where did it talk about some of the most important parts of the claims of the western Shoshone? It dealt with whether a payment dealt with those people at that time. The Timok Band, at that time, before the ICC, was their claim given up. Where was the representation? Where was the right to choose counsel? Where was the fairness, the finality? Where was that final report to Congress that said, yes, we looked at everything, we did all we could, we tried to make sure it was fair? It was 1974 to intervene, and it had been found that their rights were folded in to the rights of the Shoshones, which later netted $26 million before the Indian Claims Commission. And is now being dispersed, right? Or is about to be dispersed? There have been documents set out. There's an act that just passed, and they're just starting, right? Right. And who made that decision? The BIA attorneys, Your Honor. I think there's plenty of evidence now that could we put it on before a court to show that the proceeding was completely unfair, that we have sacrificed fairness for finality. We all want that final decision. We want to know... That's a decision Congress made, isn't it? Congress did not have a final report. Congress only... No, but Congress passed the statute, which sort of said this is the final decision of the commission, and that anything not brought that's related is waived. So this was what Congress decided. That was with regard to the Timok Band, because the Timok Band was the only colorable party that had come before the ICC at that point. When in 1974 the United States filed trespass charges against the Dan Sisters, they tried to intervene. In 1975, they immediately reacted by saying, wait a minute. We thought this was just about money. You're literally trying to take our right to live on this land where we have lived for generation after generation. They did react quickly, but they were denied. Now, the Supreme Court in 1999, when it decided the Mill Wax Bands, looked at the historical perspective. It took a long time. Justice O'Connor spent a lot of that decision discussing the tribe's usurpery rights and what the tribe fought in 1864 and 1853 and all of those times. When was that discussion ever made? Can I ask you a different kind of question? I was just confused by some of the briefing in terms of your reliance on your dealing with treaty title as opposed to aboriginal title. It seemed to me you were raising the aboriginal title issue in connection with count two, which deals with prejudgment interest, and I just wasn't clear. I will defer that argument to where to split it. Oh, okay. All right. Sorry. The reason we would ask you not to use the Northwestern Bands as any kind of dispositive decision in this is that it was an anomaly of treaty interpretation, no historical perspective. In 1999, the Supreme Court in the Mill Wax Bands spent a lot of time on historical perspective. A 60-B motion requires the court to determine what was a reasonable time. Again, I urge you to look at what was in the mind. In that regard, with respect to the 60-B issue, I realize there's the claim both under 60-B and 60-B-4 and there's an independent action, but wouldn't we have to go against or take a position contrary to the court of claims in Pueblo of Santo Domingo? Didn't that court say there that you have to bring it within a reasonable time? The court did say you had to bring it within a reasonable time. If we followed that decision, at least on that issue, that would seem to bar the claim here. And they were looking at the fact that the Quiet Title Act gives a reasonable amount of time, and so therefore, but again... No, but they looked at the, I think, correct me if I'm wrong, but I understood they also looked at the rule, the then rule of the court of claims, which is the equivalent of 60-B-4. They did. Yeah, and that would seem to bar that. Now I realize there are cases in other circuits which go a different way, but we're bound by that decision. Are you asking us to recommend that that issue be taken in bank, to be overruled? In this particular situation, it would certainly be reasonable because of the overall tribal jurisprudence that you must look at... But you agree the only way we could rule in your favor on that point is to take that issue in bank because of Pueblo of Santo Domingo. I had not considered it prior to bringing it up, but it may be that you are correct because of the expansive disposition. I realize you claim an independent action also. Right, and I focused on the independent action because an independent action and that reasonable time, I think, still requires this court to look at what the tribe or what the Indians were thinking when they waited to file that action when they did, and that was the first time they litigated the trespass action for over 15 years. They litigated the ICC case for over 20 years. What was the rush? What was the rush of them realizing finally when black helicopters show up from the government to say you can no longer use this land as you've always used it in 1999 and 2000, they now know that the right to the land was the issue. They now have actual notice, and they filed. Would you like to give some time to Mr. Herman? Yes, please. Thank you. Thank you. May it please the court, I'd like to reserve two minutes for rebuttal. I have two issues I'd like to deal with very briefly. Let me start with the 60B4 issue. I don't think this court has to take it on bank and to reverse the Pueblo case. The Pueblo-San Domingo case, which also cites back to the Andre case, were not dealing with a 60B4 motion. They were dealing with the equivalent 152B motions under fraud, which do have a time requirement. The motion that we filed in this case is a 60B4 void. It's a legion's void. There is no time limit. There never has been. You correctly pointed out the other circuits have said there is no time limit. If a judgment is void, it doesn't become valid by passage of time. In the Pueblo case and the Andre case, they were dealing with attempts by the plaintiffs to get out of stipulations. They filed them as motions under 152B saying that there was some sort of fraud and that they didn't bother. But you'd agree, Mr. Herman, your safest approach for avoiding a time bar issue is if you can make it fly an independent action claim. No, I think 60B4 allows us to file a motion alleging that the judgment itself is void. I think the facts of this case support that overwhelmingly. The issue of due process has never been dealt with by the court with regard to the ICC opinion in this case. What we allege in the complaint goes well beyond what was alleged in the Andre case and the Pueblo-San Domingo case. They were just dealing with their lawyers. They didn't understand the stipulations. We're alleging that the parties were not even represented. The Indian Claims Commission Act itself says that the exclusive right to prosecute a claim on behalf of a tribe belongs to a federally recognized tribe unless, and the exception was if there's no federally recognized tribe, then the courts could create a fiction of an identifiable group. Well, in this case, there were several federally recognized tribes, but because they did not participate in the action and did not challenge their ownership, which they believed they had to the land, the courts and the BIA created this fiction of the Western Shoshone Identifiable Group, a tremendous violation of due process under our laws, and that's one of the things we're attacking in the complaint, that I believe there is no time bar to that. Well, Liz, the provision says the motion shall be made within a reasonable time, right? Well, that provision, with all due respect, Your Honor, does not apply to 60b-4 or the previous 152b-4. It applies to the other 60b motions that can be made. Moore's Federal Practice and all the case law in interpreting 60b-4 have said there is no time limit if the opinion or the judgment is void. If I could then, with my remaining time, I'd like to turn back to the Treaty of Ruby Valley. There has never been a court that has dealt with the interpretation of the Treaty of Ruby Valley. The previous decisions, Your Honor referenced the Dan case. The Dan case was referring to whether or not there was finality because there was not payment, and the Supreme Court said it doesn't matter. If the money is allocated, there is finality in the decision, but it never interpreted the ICC opinion as to whether or not treaty title was considered. If you consider this case like a chain link, and you begin the first chain of opinions in this case is the claims commission opinion, which on its face is limited to aboriginal title. From that, there have been various decisions, each one referring back, including the Dan case. They said there was a finding that there was no aboriginal title. What we're alleging in this complaint, in this action, is that there is treaty title, a separate and distinct title that has never been adjudicated. The lower court, Judge Smith, relied on the Northwestern Shoshone opinion from 1945, and he made a finding that the Treaty of Ruby Valley doesn't convey recognized title. Respectfully, he's wrong for several reasons because the treaty that was at issue in the Northwestern Shoshone case is the Box Elder Treaty. The Box Elder Treaty is significantly different than the Treaty of Ruby Valley. I'd like to point out the two significant differences there. The first one is that the Box Elder Treaty had a clause which said that the Box Elder Treaty does not create additional title that did not exist before. In other words, the treaty is not creating title. On its face, it's a statement in the treaty itself that there's not recognized title. The treaty at issue in this case does not have such a clause. It's a significant difference. I think in the opinion, the Northwestern Shoshone opinion, the court makes reference. It says that all the treaties that were signed at the same time had that clause except for one. I'm not sure if the court was confused and they thought the Treaty of Ruby Valley had that clause or the one that they were accepting out was the Treaty of Ruby Valley, but in any event, they were not interpreting the Treaty of Ruby Valley. Of course, that would be an incredible violation of due process to bind the Western Shoshones in the Northwestern Shoshone case who were not parties and their treaty was not at issue. The 1962 finding of the commission that title is extinguished is only aboriginal title in your mind. Correct, Your Honor. If all the aboriginal title is lost, was it re-granted by the Treaty of Ruby Valley? No. In fact, the treaty title is a separate and distinct kind of title. The case law recognizes you can even sell one of your titles and keep the other. Losing aboriginal title, which is a right of… The original title, everything they once had, they no longer have. Now, why doesn't that extend to anything that would have happened at Ruby Valley, which, as we both know, was not very favorable to the tribes at all? Well, because the Indian title, I think the court correctly points out, common sense tells us that that title would be a greater title than some title created by a treaty. But under our laws, it's not. Unfortunately for the Indians, that's a much worse title because it's a right of occupancy, which the government can just push you out. The significant difference is that if it's treaty title, it's equivalent to fee title. And if they've lost that fee title or treaty title, then they're entitled to interest on the loss. And that's what's at issue here in that count is that if the treaty conveyed title… Are you talking about count two? Yes. Okay. If the treaty conveyed title, and that's loss, and no court has ever made that ruling that treaty title's been lost. If the court makes that ruling as loss, then they're entitled to interest going back from the date of the loss, which I think is 1872. But the 77 judgment gives $26 million for the land and everything in it, the assets, the mining rights, everything. Not interest. And that's a big difference because… That judgment then goes into a fund, which has accrued interest to this date. So, yes, it has interest in it. For everything that was awarded to you in 77, which is compensation for all the land. Right. Well, the way it works is that in 1972, when they make the finding that they owe $26 million, they're valuing the land in 1972 at 1872 prices. And they say, okay, we're going to pay you $26 million in 1972 because that's what we owed you in 1872. If there's recognized treaty title, the equation is different. And the law says that's equivalent to a Fifth Amendment taking under a constitution of the United States that they're owed interest from 1872. That's a $14 billion difference. So the interest is predicated, the prejudgment interest is predicated on our finding treaty title. Exactly. Not on the award that you've already gotten that you're independently entitled to prejudgment interest. Correct. And there's one other distinguishing factor I want to point out for the court, which establishes, I think, why the Treaty of Ruby Valley is different than the Box Elder Treaty that the Northwestern Shoshones have. And that is, in the Treaty of Ruby Valley, the government, in their negotiations, makes the Western Shoshones responsible for safety on their own land. It makes them essentially internally policing their own state. And it says that the Western Shoshones have to guarantee safety. And the language says that... Can you draw this to a close, Mr. Herman? Yes, in 20 seconds. The Treaty of Ruby Valley says that if there's depredations committed by Indians, by bad men on the reservation land, the Western Shoshones are responsible to bring them to the United States for punishment and that they have to guarantee the safety of the white men. That's similar language that was in the Fort Laramie Treaty. In the Crow Key case, the court said that is the significant language that indicates that there was recognized ownership of land. If the government says to the tribe, you're responsible to police this land, then that's the same thing as saying that's your land. And if there's a taking, it's a Fifth Amendment taking. The Box Elder Treaty did not have that language. It talked about safety. It did not make the Northwestern Shoshones responsible to police their own land. We submit that's a significant difference and that the court once and finally should consider and evaluate and analyze the Treaty of Ruby Valley and say it does have treaty, it does recognize title or it doesn't, but the Western Shoshones have no title to that analysis. Thank you, Mr. Herman. I'll restore Mr. Herman's two minutes of rebuttal. If you could give Mr. Haig four additional minutes. We went over two. Plus is two. That will even things up. Mr. Haig. Thank you, Your Honor. May it please the Court, I'm Mark Haig from the Department of Justice for the United States. I guess I wanted to start out by trying to focus the point on what the issues are here today. Just for my purposes, has the Treaty of Ruby Valley ever been properly disposed of by all of these various rulings of the Indian Claims Commission, the Court of Claims, the Supreme Court, and everyone else who's dealt with it? I believe it has, Your Honor. I believe that when we set out in our brief, the distinctions that the tribes were attempting to draw between the Treaty of Ruby Valley and the Treaty of Box Elder don't stand up. The Supreme Court's analysis said that these treaties, the Supreme Court looked at all five treaties and concluded that none of them either recognized title or ceded title. They just left the question open. They're merely treaties of amity and friendship. What about the two points that Mr. Herman mentioned about the differences between the Ruby Valley Treaty and what he said were the other treaties, the Clause 4, the first one, and the second one being the clause that required the tribe to turn over to the authorities, the government authorities, people who violate the treaty obligation? Well, that second argument, this is the first time I've heard it. I don't believe it's raised in the briefs or raised below, and I'm not prepared to address it right now. But the first point, this court, in one of the decisions reviewing the ICC earlier decision, specifically addresses and rejects the idea that the distinctions between the Treaty of Ruby Valley and the Treaty of Box Elder are of any consequence. I'm looking at my notes to see which it is. The Box Elder Treaty is the one that induces the tribes to settle in Idaho, finally, Fort Hall, Idaho. Is that right? I don't know. The distinction that's discussed in the decisions, in the ICC decision in particular, is the language about the Senate amendment, which creates this... Would it be the Timo case, 593 Fed Second? Do you think it's... Yes. It's the 79 case. Yes, the 79 case. That's the one you say that draws the distinction, that focuses on the Clause 4 point that Mr. Thurman was raising? I believe that's right. The four other treaties had these references to the lands acquired in the Mexican Cession under the Treaty of Guadalupe Hidalgo. And I believe it's even in the Supreme Court Condam talks about how this language doesn't change the analysis with respect to whether these treaties extinguish time. The other point that Mr. Thurman was making, I guess two points, is... These all go to the interest question, right? And wouldn't we still have the enormous difficulty of getting past a sovereign immunity waiver for the interest, even if we were to examine and find that there was some treaty title that had not been resolved? We're still... We don't get to the substance of the treaty until they get it to court. And this case was dismissed for failure to state a claim and for... Because it's untimely, because for lack of jurisdiction due to the finality provisions of the Indian Claims Commission Act and the generic statute of limitations. So if they lose on... And that's count one. That's all five cases. Okay. And the claims... The arguments that Mr. Herman was making about the treaty title or fee title, those are the claims that are associated with the quiet title action, which was separated out of this case and sent to the district court in Nevada. If Mr. Herman is correct that the western Shoshone still have fee title to some lands, then there hasn't been any taking. But that's the question that's in the quiet title action claim. The claims that are here are the count one, which is to attempt to set the judgment aside, the ICC judgment. And that judgment became final in 1979. There's nothing new that they are alleging now that could not have been raised either before the ICC or before the Court of Claims when the judgment was reviewed on appeal or timely thereafter. There's no reason for a 24-year delay. So a challenge based on... under Rule 60b-4 or an independent action is not timely. And it also fails to state a claim. And as Judge Smith pointed out below, the grounds that the tribes are raising here for setting aside the ICC judgment are grounds that this court or the claims court had previously considered and rejected in the western Shoshone legal defense case and the Timohawk Band case. I take it the Ninth Circuit has not yet ruled in the Dan case? Is that the case that was pending? No, I'm sorry. No, that's right. That's not the case. The Quiet Title case. That has been briefed, but the Ninth Circuit has not yet ruled. In other words, what's in the briefs is still up-to-date in terms of information? Yes. Well, it has not been briefed. It was pending. It had not yet been briefed. In this case, it was filed. Count two, the prejudgment interest award. The case law is clear that the ICC didn't have the authority to award prejudgment interest, but to the extent that anyone wanted to seek prejudgment interest on that claim, the time to do it was in 1977 when the judgment was issued, or in 1979 when the court of claims affirmed that judgment, so it's untimely. Counts three, four, and five are the claims for royalties under the Treaty of Ruby Valley and accounting under the Treaty or breach of trust under the Treaty. And again, those claims are barred by the discharge provisions of the Indian Claims Commission Act. To the extent that they were going to be raised, they needed to be raised by 1951 under the ICCA, and they weren't, so their time barred. And they also failed to state a claim because they're premised on the view that the Treaty of Ruby Valley recognized title when in fact the Supreme Court and the Indian Claims Commission and the Ninth Circuit have all recognized that the Treaty of Ruby Valley did not recognize legal title. What about the accounting action? Is that equitable in nature? It sounds like it's based on money and belongs in the Court of Federal Claims, but is it equitable and thus district court action instead? It is equitable to the extent that it... You can't... A plaintiff in the Court of Federal Claims is only entitled to an accounting if he is able to establish liability on the part of the government, and in the absence of a showing of liability there's no freestanding right to an accounting. And here, because the complaint does not state claims that would provide a basis for establishing liability, the accounting claim fails for that additional reason. And it's also a time bar. If I just... If they had just requested accounting freestanding on obligations, would that go to the Court of Federal Claims or trust obligations or so forth? On trust obligations, but to do that they would have to identify some... What about potentially? Can they identify a potential liability and on that basis request an accounting, or does it have to be an established liability? I suppose you can allege... The United States has a trust obligation under X. We request an accounting and payment and that would be enough. But here, when they say the United States has a trust obligation under X, the X that they point to is the Treaty of Ruby Valley. And a claim, because the United States has taken the position since 1951 at least in the ICC proceeding, that the treaty did not create any rights to the extent there was a trust and trust has been repudiated. And the time to bring a claim for breach of that trust accrued in 1951 at the latest. Our procedural law tells us that an action to challenge a void action is not subject to any time limits. Is that what's happening here? Are they challenging as void some subject matter? It is true that some other courts have held that the Federal Rules of Procedure 60b-4 challenge that a judgment is void is not subject to any time limitation. But here, the Court of Claims held in Pueblo of Santo Domingo that Rule 60b means what it says that the time, within a reasonable time... Now, Mr. Herman says, though, I think as I understand Mr. Herman, he would argue, or maybe Ms. Herman, I'm not sure who was making the argument, but anyway, the other side would argue that that case was not speaking to a 60b-4 voidness issue. It was just people who were trying to alter or get out of the stipulation. And I looked at the decision. It talks in terms of 60b. It doesn't focus in specifically on 60b-4, I think. Well, I will take your word for that, Your Honor. I was trying to find it in my notes there before when he said it, and I couldn't find it. Whether or not... This is not a... Typically, the challenge to a judgment as void comes up when a court enters a default against someone who doesn't even know that the judgment has been entered, and then they discover that it's been entered, and they come into court and challenge it and attempt to get it set aside. Here, the... No, the title was at stake until, to use the colorful language, the black helicopters arrived. Well, I don't think the record supports that contention. And in fact, in this court's 1989 case, Timor case, the court points out in declining to allow another attempt at intervening in the ICC proceedings and recounting part of the ICC proceedings. The court reviews again the fact that all the parties had knowledge from the beginning of the ICC proceedings as to what the nature of the claims was, and that they waited, and they didn't seek to intervene until long after the judgment had been entered, the choice, selection of remedies had been made. So there's just no support for that assertion that they didn't have knowledge until the Dan case. I forget whether there was a second part of your question. In any event, the judgment of the Court of Federal Claims is correct and should be affirmed, and if there are no further questions, I will proceed to that. Thank you, Mr. Hague. Mr. Herman, you have two minutes. Thank you, Your Honor. Your Honor, I did read the Pueblo San Indigo case many times, this morning included. There is no reference to void judgments anywhere in this case. It's talking about 60B, previously 152B, and an attack to undo a stipulation. It is not on point for this case, which we are attacking under 60B-4, saying it's a void judgment, and could not find a case anywhere that says there is a time limit for void judgments. So we submit we're timely on that issue. Why would this judgment, Mr. Herman, be void? It's void for lack of due process, which includes many things. As we allege in the complaint, there are several things that went on in the proceeding that makes it void, beginning with the fact that the Western Shoshone Nation is made up of, I think it's 11 bands or tribes of Indians. Most of them are federally recognized bands. They're sovereign nations in amongst themselves. They're different parties, and they were not participants in the litigation before the Claims Commission. And yet, the courts and the government is trying to hold them and bind them to findings. They weren't there to represent themselves. But does that... No, I understand what you're saying, but that wouldn't mean that the judgment is void. The judgment itself... But from what you said, you were making an argument that would seem to me to say, the judgment is not void, but it shouldn't be applied to us. Well, I'm beginning with who the parties were. Then the parties that were there fired their lawyers and argued in a position that their land was never lost. Incredibly, the court with the government said, you cannot change your position in the proceeding. Nowhere else in jurisprudence can a party be refused dismissal of their own claim. When the parties that were involved in litigation found out that the position being taken on their behalf was that they had lost their land, they disagreed and said, no, that's not our position. They tried to fire their lawyers. They told the lawyers that's not our position. The government was aware that that was the position. The BIA was aware that's our position. And the court said, we're not going to let you withdraw from this case. You're stuck in the case. That is a violation of due process. Plaintiffs have the right to control their own litigation. There were other things that we alleged in the complaint that tantamount to a violation of due process. Now, we haven't had a chance to even make those arguments because we're dismissed. The case was dismissed. We're saying we've alleged a complaint that at least goes to the next stage, and these are very valid questions that I'm sure we'd be asked, and we would answer those questions as well. Mr. Herman, I have to keep the time pretty even, so if you could draw this to a close, I'd appreciate it. Yes. In conclusion, Your Honors, and I think you can see by the questions and we're referencing different cases is that what's happened here, there's fragments of cases. It's one of the only cases I've ever seen where there's never been real consideration by a court of fundamental issues to the case. What does the treaty say? What really happened before the Claims Commission? You have this chain-link fence, or this link that had little bits and pieces, and here we are in 2007 where we can't even refer back to a case and say this is what was found by the court. They're always been dismissed for technical reasons, denials on motions intervened, where the consideration, full consideration, was never considered. We believe that we've alleged the appropriate legal foundations to go to the next step, that this case should not be dismissed, and we should have the next step, which is getting into these issues in the case. Thank you, Your Honors. Thank you, Mr. Herman.